525-0807, DeVore v. Camp. Mr. DeVore? Yes, ma'am. You're the appellant? Yeah, I'm one of several tax payers in Asia, yes ma'am. Understood. Are you ready to proceed? My report's ready, yes ma'am. We're ready. If it pleases the court, my esteemed colleague, this case comes in front of the court on the appeal of a taxpayer objection. I was just one of the many tax payers who brought this suit in Bond County, which deals with the publication of the statutory required notice. This case is actually a case of first and And when I get into the facts, I think the court will understand why, because it deals with, for the first time, an appellate court is dealing with a mandatory publication out of 12-10 that was actually filed in the subsequent tax year. That's never happened in front of the courts. Okay? So that is why some of the cases that we'll talk about that are cited by my colleagues don't apply here. Not only did they deal with a different statute, the statutes are fundamentally still the same. The governing principle, though, of the Andrews case is still the same, and what that says is that this particular publication that used to be under section 103 of the old statute, now under section 12-10, is mandatory. It must be followed, and if it is not followed, then that increase for that particular assessment year is invalid and it's void. So the question for this court is going to be, based on the writing of the statute, did they comply or did they not comply? I don't know that there's a big dispute in that particular legal standard. Now, the 2022 tax year we're dealing with here, the court can find that when it looks at the publications that were made. They're in the record, they made two publications for the 22 tax year, at C-248 and C-256, where it says that they're complying with 12-10 for the tax year of January, starting January 1st, 2022. So that tax year is important, and if you look at the statute, and we argued it at the trial court level, the actual definition in the statute for what does it mean, year, because we're talking about a tax year, the definitions say calendar year. So I think that's important, we're talking about the calendar year, the tax year, the assessment year of 2022, ended in December 31st. They publicized again in June, July, 2023. The statute, I think, when the court looks at it and breaks it apart, again, that I believe they concede will be mandatory, says as soon as the chief county assessment officer has completed the assessment, that's where it starts. Now, they do not ask you to stop there. There is a relevant standard for as soon as you've completed the assessment, because even though the facts aren't present here, if the court reviews the Corenson case, I can get the site. It is 106-3D-975. What you'll find is that as soon as it's completed, that was a case where there was no particular issue with it being a different tax year, is they waited a couple of months after the assessments were completed before they published, and that court said you took too long. Again, that's not what we have here, but I just point that out to you for the point that as soon as you're completed, let's have a relevant standard. But then if you go to what we're talking about here, it says they shall publish in each year of general assessment. That is the operative language here, in each year of general assessment, shall publish. In each year, what does year mean? It means that particular year that ends on December 31st, 2022. They don't talk about the language in each year. Their proposition is that, well, we're in a quadrennial year, which we were, and in a quadrennial year, the publication requirement doesn't apply. Their proposition to you would be, as in a quadrennial year under a reading of the statute, there is no deadline. They can just go as long. And you disagree with that? Absolutely. Quadrennial, dividing it up into what is a quadrennial year versus not. Yeah, in a quadrennial, if you go back to the old statute, Pam, I think this may make sense. In the old statute, it said in a quadrennial year, you still had the language you had to publish in the year of assessment. But in a non-quadrennial year, you had this July 10th deadline, which makes sense, because what they were saying in the old statute is that if it's a non-quadrennial year, your taxpayers are not under the impression that there's going to be a change in their assessment, because that usually happens in quadrennial years. So in a non-quadrennial year, you had this earlier date that you had to publish to give the people extra time to say, we're changing your assessment this year, even though you're not in a quadrennial. But then they changed that in the new statute, and now it just says December 31st. But what they didn't change in either statute is the language that you start to publish in each year of general assessment. It says it right there, I've got it bolded in 12-10. So the language, again, in each year of general assessment shall publish the complete list. You know, you have this question in the statute that I don't think you have to get to, where it says the publication shall be made on or before December 31st. Is the statute referring to only the non-quad year? Is it referring to the quad year and the non-quad year? I don't think the court has to get there, because you still have the operative language, shall publish in each year of general assessment. I just have a question. Yes, sir. Under your interpretation, what is the purpose of as soon as the chief county assessment officer has completed the assessment in the county or in the assessment district? What's the purpose of that? I think the purpose, if you look, it's a good question, sir. If you look at the Korzen case, I think that would answer it. So what that is saying is, let's say in a quadrennial year, the assessor finishes their assessment in June, and they waited until December to publish. There is a separate legal argument under the Korzen standard that would say even that is a violation of the statute, because you waited too long after you had completed. Okay, so if we had a fact pattern that they published it in December, but they finished in June, and that was the argument being made, it's still within the tax year, but it wasn't done as soon as they completed it, and the Korzen standard would then apply. That's why it's separate. It's two distinct requirements. As soon as you're done, and again, Korzen said two months was too long, sir, after you were done. But it still, nonetheless, has to be in the year of general assessment. I hope that answers your question, sir. Thank you. Yes, sir. Let me ask you to clarify. It's kind of a larger picture here for me. So if you would. Yes, sir. The assessments we're talking about were ultimately published before the taxes were due or paid, correct? Yes, sir. So are we talking about procedural noncompliance is the issue here? Well, there is some case law, sir, that they talk about, whether if you still got notice and you still got a chance before. And I think the Andrews case takes care of what you're talking about, because the Andrews case talks about, Your Honor, this is not a due process issue. It specifically took this on and said this is a statutory mandated publication. We're not talking about due process. And since you violated a mandatory requirement of publication, we don't get into due process. We don't get into whether there was an injury or not an injury. It doesn't matter. You violated the statutory deadline for filing. I think Andrews takes care of your concern there, sir. In this case, we don't really have a prejudice or injury. It's the noncompliance you're focusing on. Correct. And again, if you read Andrews again closely, the injury or the prejudice, I've actually got, if you look at the no injury part, they specifically take that on in Andrews. And there's a specific language in there that says the injury is not even, we don't even get to that. We don't get into prejudice or injury. This is a mandatory duty. You blew it. We don't even go down that path. But you're asking that the assessment be declared void? What the remedy in Andrews also says, Justice, is that if that assessment publication was not made, then you use the assessment from the prior period. So there's still a tax burden. It just doesn't have to, it doesn't receive that increase that they put in for that particular tax year. But that is an injury to the taxpayers because they may be paying more, and if we void it, it goes back to the prior year. Well, anyway, that would be the injury that this court is remedying, yes. But it's saying, but I think what the justice was asking, well, you still got a notice in 2023. You still had a chance to object through the normal objection process. What's the injury? And, again, the Andrews Court, Foxworth says, that's not even a question for this particular objection. This particular objection is a statutorily mandated. It's not, you don't have to maybe follow it. You have to follow it. No, but we have to find, if we agree with you, we have to fashion some sort of relief based on your argument, and what would that be? Correct. And, again, following the case, excuse me, Justice, it says that the relief is that, let me use this as a hypothetical. Your assessment in 2021 was a 10,000 assessed value. They put a 2,000 increase for 22. That increase is not allowed because you violated it. It goes back to the 21, 10,000 for that particular tax year. That's the remedy that I'm asking. That's the remedy that Andrews authorizes. Okay, so the remedy would be that we would roll back the assessment to the prior year. Correct, ma'am. And then however that impacts the taxpayers would have to be figured out. Yeah, those calculations are pretty simple. And for that tax year, and, again, the numbers for each taxpayer are in the record. The clerk would easily, or the assessor, can calculate those to say, okay, you were 10,000 in 21. You were 12,000 in 22. Assess value, ma'am. Right. It goes to 10,000. And, again, I think the Andrews court exactly took that on, and that's exactly what happened. Now, one of the things that they'll argue is, again, is this is a nonquadrennial. This authority for Andrews is nonquadrennial. They cite that as that doorstep. Those cases are particularly important because in each of those cases when we had the old statute of July 10th, the Andrews case blew the July 10th deadline. Okay, and the court said in both. Dorfler and Ball, those were the years that were quadrennial years. And they still published within that tax year. This is imperative. They still published in that tax year. It was just after July 10th. And the Ball and Dorfler case said it's not a violation of the statute because July 10th only applies to nonquadrennial years. That doesn't stand for the proposition that in Ball and Dorfler they could have published in the next tax year because each of them still published before December 31st within that year, which the statute says is the calendar year. That's why those cases, I don't see an issue with those holdings. They just don't apply to the facts you have here. And none of this authority stands for the proposition that they're going to rely upon that you can publish into the other year because what's the guardrail? That's what I said to the trial court. If they're saying as soon as we complete, they can complete the 2022 tax year and after the 2023 tax payments are due, I mean, that becomes irrational and absurd. And that's why if you go back to the language of the statute, it says he or she, after you're done, which again, based on your CERF, even if they were done in June, you can't wait until December under that standard. That's what as soon as you complete means. Separate requirements still says in each year of general assessment, which means that assessment publication has to be published before the end of that year, which again, based on the definition is the calendar year. That's what they blew. And that's why the publication was invalid. And Andrews applies. So do you believe that this deadline should apply every year? The deadline of December 31st applies every year. Every year without distinction on quadrennial years. Correct. Because it used to be July 10th, ma'am, on the old statute for non-quad years. Now they've changed the statute and the December 31st date is the same regardless of whether you're in a quad or not. Because again, ultimately it leads within each year of general assessment and then it talks about the publication of 1231. So yes, regardless, you have to make this mandatory publication before 1231. And is there legislative history that you can rely on to support your argument? No, ma'am. I think it's just a clear interpretation. I didn't have a legislative history. I believe the language of the statute, once you parse through it, I think it speaks for itself. It sounds like the old statute was pretty dissimilar to this new one. No, I think they're almost exactly the same except for the July 10th deadline that used to require our assessors to publish earlier on these non-quad years. They now are able to wait until December on the non-quad years too. I think that's the only change, ma'am. But they distinguished between quadrennial years and non-quadrennial years. They did. And I believe this one does too. Yes. That's why I'm interested in your argument that it should be every year. There must be a reason for the distinction. Why would the statute discuss two different… If it's 1231? Yes. I think it's a good question. But again, I think the last sentence, the publication shall be made on 1231 of that year. There's two publications depending on… There's one publication. It just depends on what year that you're in. So, again, it clears to me that if you're reading the statutes that it's now saying 1231 is the year for both. Because I think even if you go to the old statute, it was still clear it was 1231 for a quadrennial year, July 10th for a non-quadrennial year. And they changed that. So there is no purpose to putting a calendar date in the second paragraph. There's no purpose to saying December 31st rather than as soon as and in each year. Correct. I think they both roll together. I think the statute could be… You could look at this and say in each year of assessment, it says the same thing. I think that language was there when the July 10th was there. And now that July 10th is gone, they're both saying the same thing. So if I'm getting your argument, everything has to be done by the first of the year. But in the quadrennial years, it has to be done as soon as it's finished? Yeah, I think it has to be done as soon as it's finished. It's never been argued other than the closing case. I've never seen the appellate history. I think there's two separate components there. As soon as you're finished, some reasonable time after. But it has to be done in that calendar year based on the interpretation of the statute. Okay. Okay? Anything else? One question on what you're asking this court to do as to the remedy. You're not asking the court to find the assessments invalid. You're just saying that the obligation to pay those assessments is invalidated because of the publication date. Correct? I'm saying that the increase, sir. So the increase that that taxpayer received for that tax year would be invalid. Not that their tax bill is invalid. They still owe taxes. But their taxes are quantified based upon the assessment that they got valid assessment the prior tax year. It has to be calculated on that and not that incremental increase in this late publication. They don't pay a tax on that incremental part. Are we supposed to consider the folks whose assessments went down? I don't believe anybody in here's assessments went down, sir. That's quite an assumption. No. I don't believe that. No one in the county had their assessment go down. What's that? No one in the county had their assessment go down. Well, the people that complained here. Right. But what you're asking is for us to declare that statutory violation. I mean, doesn't that affect the other taxpayers? No, because they're not in front of you. They didn't bring that case to the court. Once you've paid and you didn't file a timely petition for a taxpayer's objection, you lose any right to complain, sir. So the other taxpayers have no argument in this court. And you get to bypass the Board of Review? You can bypass the Board of Review with a timely filed taxpayer's objection. You can't, yes. Why is that remedy not adequate for you? Now, we actually did go to the taxpayer, the review board. But on these types of violations, sir, if you're filing a taxpayer objection based on these types of mandatory statutory duties, you can, if you want to, go around the Board of Review. We went to the Board of Review. But, again, you could if you wanted to. Thank you. Before you leave, you raised an interesting question. So the only remedy that's available, if we would grant relief, is to the individuals who are before this court. It's not a global kind of remedy. Correct, yes, ma'am. Because when you want to file a taxpayer objection suit, you've only got, like, 75 days after you've made your second payment. And if you don't file a timely petition for taxpayer objection, you've waived any right to complain. So your only request of relief here is for the pardons in this case, because they're the only ones that file a timely objection. But if the court agrees with you, then for subsequent years, then the law is as we dictate it. Yeah, well, you heard the case the way we're asking. You have now created the law that says you have to publish these by the end of December. And I'm here for purely difficult court. That's already happening right now, anyway. Okay. So is this moving? No, because my taxpayers still have an injury. Okay. But it is an important question, Justice. Well, I think it is, because it affects not just this county or your taxpayers, but the state globally. Correct. And again, all we're asking is a ruling that says that publication, you have to publish it within that tax year, because that's what the language says. My clients get some relief for what it is. But as importantly, you have been laying out authority, to the extent you agree with my clients, that's clear. And if you were to disagree with my clients, that authority could be that an assessor in a year, that publication could be whenever they get to it. It might be two, three years down the road. It just becomes untenable, because there's no guardrail. Thank you. Okay. You will have a few moments after your part.  Thank you, ma'am. All right. Thank you. Okay. Would you like to address the court, Mr. Cook? Yes, Your Honor. May I please support the counsel? My name is Matthew Cook, and I'm here on behalf of Giffen Winning. Just speak up. I apologize. My name is Matthew Cook, and I'm here this morning on behalf of the law firm of Giffen Winning. We contract with the state's attorney's office, and we help them and assist them in matters concerning property tax appeals, such as the one before the court today. So, as counsel has indicated, the issue on appeal here involves the interpretation of the timing requirement in the statute as it pertains to the publication of assessments. So, here we're dealing with, as counsel has indicated, the quadrennial year, not a non-quadrennial year. So, in fact— Let me stop you. I don't think he makes a distinction, if I understand his argument correctly. So, our position is there is a distinction as to the publication requirement between a quadrennial and a non-quadrennial year. So, he did—he distincted there were two types, but under the appellate's view, it is their position that the December 31 deadline applies to both situations, whereas the appellees do not agree with that. Okay, but you started out your argument by saying that this applies to a quadrennial year. The text here in question is a quadrennial year.  Okay. All right. Go ahead. I'm sorry. Yes. So, it's your argument that the words, in each year of general assessment, identifies or distinguishes between general assessment and years other than general assessment. That is correct, Your Honor. So, it's not that you have to publish in that year, but as pertains to those years is your interpretation. That is correct. Okay. Thank you. Yes. And again, the tax year at issue here is the 2022 tax year. The assessments in that year were completed on June 16th of 2023, and publication was made on June 23rd of 2023. Now, Bond County did have to do another publication because there was an incorrect assessment. That publication was made on July 25th of 2023. Excuse me. And again, the error in the assessment affected no taxpayer in this case before the court. And so, what the appellee is asking the court is to affirm the trial court's decision to grant our motion for summary judgment and deny the appellate's cross-motion for summary judgment. And we ask this for three reasons. The first being that the plain language of the statute in question directs that publication in quadrennial years, assessment years, be made as soon as the assessment has been completed. Two, the appellee's interpretation of the publishment requirement in quadrennial years is consistent with established case law from the Illinois Supreme Court. And third, even if the appellant's argument or interpretation of the statute is accepted, the relief requested by the appellants in the lower court is not supported by the property tax code at issue. So, again- What do you mean, the relief requested? The relief requested. So, the relief requested in the lower court was that the 2022 tax assessment be invalidated because of the alleged late publication, and they want to revert to the 2021 year assessment. It is our position that that is not a valid relief to request in this situation. If the court agrees with the plaintiffs here, when you say that's not appropriate relief, I don't understand that part of your sentence. Why wouldn't it be appropriate if the court agrees with their position? So, in 1994, the legislature enacted section 26-5 of the property tax code. Therein, it states that an assessment completed beyond the time limits required by this code shall be legal and valid as it completed by the time required by law. They further enacted section 21-185, which reads that no error or informality in the proceedings of any of the officers connected with the assessment are collecting of taxes not affecting the substantial justice of the tax relief itself shall initiate or in any manner affect the tax or the assessment thereof. So, it is our position that even if the appellate's argument was accepted and that publication was, in fact, late, the law under the property tax code here in Illinois does not allow for the assessment to go back because it will be deemed as though it was done on time. And what's the section of that sentence? I apologize. What's the site of the section? That would be the property tax code, so 35, and that would be at 200 in section 26-5. And that section was enacted by the legislature in 1984. I'm just curious how the legislature can enact a statute that would somehow be in conflict if we declare a statute, the interpretation of the statute and the conduct void of the assessor. In other words, if we declare that they're entitled to the relief and they wanted to go back, the only way for us to do that is to say they violated the statute. And then we have another statute that says, well, that doesn't matter. That's what you're arguing, right? Essentially, yes, Your Honor. We did pull the section 26-5, so it is a unique circumstance, I do agree. But it is our position that the assessment, if it was completed beyond the time limit, it still is so. No big deal. What is the remedy that the General Assembly, taking this tax code as a whole, envisions for such a violation? No harm, no foul? Well, it would assume that there was a violation, and it's our position that there was not a violation. So we don't believe that there is any remedy that is necessary for this particular circumstance. Now, hypothetically, if this were to get to the place where that happens, then that would be something that the legislature would need to address at that point, because it is our position that right now, currently, as we interpret the statute and the publication requirements, there was no violation, and there is no relief that needs to be made. But that wasn't the question that was asked. Oh, I apologize. I must have misunderstood. Well, as I understand Justice Clark's question, he wants you to assume hypothetically that we grant the relief, and you're saying no harm, no foul. Isn't that the question? That was the question. You grant the relief. If we agree with the other side's interpretation of the statute, and if you argue that the relief they're requesting is improper, my question is what is the intent of the General Assembly taking these statutes that have been quoted to us in total, which I think is one way to interpret the statutory intent, take all the statutes on the subject in total, what is the intent of the General Assembly should be the relief? And is your answer nothing? My answer at this point in time would have to be that the intent is something that I did not look into for that particular scenario, because we are under the operation that there was. I'm not trying to ask an unfair question. I'm really not. No, I understand. I'm just, under your interpretation, what happens if they wait five years? Under our interpretation, if they wait five years, as ridiculous as that sounds, our interpretation of the statute allows that to happen. Okay. And, again, it's an absurd result, I do agree, but it is the result that we interpret nonetheless. And it is even in the Anders case that the appellates cite to, the Illinois Supreme Court even identifies that, in fact, in the court's analysis they actually bring that to light. And they say that although there is no prescribed date for the publication in a quadrennial year, it was the court's opinion in that case that the legislature intended the taxpayers could at least rely on the July 10th deadline when it was a non-quadrennial year. So their analysis even acknowledges that there's no prescribed date of publication under that statute, as it says that it should be done as soon as it is completed. Now, when it is completed, the statute does not give us a date, as the December 31st deadline applies only to the assessment in a non-quadrennial year. But the other side says it's a matter of first impression. Is there any case law, Supreme Appellate, to support your side? Yes. So we have cited in our brief, it is the 1961 case of People, Exwell, and Wall. I'm sorry. Poor question. After the amendment, any case law looking at the statutes after the amendment? After the amendment, we have not come across anything. I apologize for the poor question. No, you were fine. I do know that the Anders case, I believe, was the 1972 case, and then we have the 1961 case with Wall. But that is the case that the appellee finds controlling here in this situation. And in that case, it involved the 1958 quadrennial year assessment, where the publication of those assessments was made starting on July 31st. And, again, under the statute at that time, it was required that the assessment in a non-quadrennial year be made on July 10th. So in Wall, it was a quadrennial assessment. The publication was made starting July 1st of 1958, with the last publication being made on October 2nd of 1958. And, again, it is the same language that we see in the statute today as it references to quadrennial year assessments. So in that case, the court concluded that it was clear from reading the language of the statute, with reference to the requirement for publication in quadrennial years, that all that is required is that the chief county assessment officer is required to publish the quadrennial assessment as soon as he has completed the assessment. And as to the other non-quadrennial assessment years published, assessments were to be made on or before July 10th. So they do differentiate and identify and call out that the quadrennial assessment is due to be published as soon as the chief county assessment officer has completed that assessment. And that's the statute today. It is the same language in the statute as today's. Yes, Your Honor. As it pertains to the quadrennial assessment. Now, I know as the counselor has already called out and correctly called out, is that the minor changes that do occur in the statute between then and now have to do with the non-quadrennial years. And it was, there was the change from the July 10th to the December 31st. And then there was also, I believe, the changes as to the population. Because this, the statute as it stands now, says that in the counties with inhabitants of 3 million or less, those numbers were different than the prior versions. But it is interesting that the date got changed from July back to the calendar year. And would you maybe concede that there's an intent to provide some consistency there? I would not concede to that point because... I didn't think you would. The language that's in there is that if the inclusion of the words as soon as completed in reference to the quadrennial year assessment, that has remained and that has never been removed. And so that is found within the same sentence that requires that the assessment be made in a quadrennial year as soon as the chief county assessment officer has finished her assessments. But if you have an assessor who has insufficient funds, for example, to have somebody assess the property because of the inadequate funds from the county, so that it's delayed, how long can you delay it? So from what I understand, there are actually multiple ways that the assessments can take place. And in Illinois, I'm not an expert, but I do know that there are different, I guess you would say methods of assessment. So those methods do account for the fact that a single assessment officer in no way could be able to assess the value of every single property in a county. And so different counties have employed different methods and different calculations. My question is, how long can you wait? For the assessment? Are we talking in a quadrennial year? Yes. So it would need to begin within that year as the statute prescribes. But again, the publication of those assessments, that's kind of an open issue here with the language of the statute because it just simply requires as soon as, or publications require as soon as the assessment has been completed. So you could wait until after the tax is due and then find out later that your tax bill went up and now you have to pay more. Theoretically, our position would say agree to that. And yes, and it is a different, it's a unique conundrum, but it's one that has not occurred yet. Theoretically, you have a different requirement in a non-quad year, right? That is correct. For publication? Yes. Correct. Yes, Your Honor. You're arguing that's a different standard, so that may serve as a backup to assessments. That is correct. I am arguing that that requirement is the December 31st deadline that is discussed in that statute. Thank you. Of course. We cut you off from your argument, so if you would like to proceed on another issue or you have some time. All right. I do, I will address the argument that the Anders versus Foxworthy case that the appellants have presented, they say that that is the controlling case law. The appellees do disagree. Again, the Anders case does involve a 1972 year assessment, which was a non-quadrennial year, and yes, there was a failure to timely publish on the July 10th deadline. I see that my time has expired. Go ahead if you want to finish that up. Okay. Thank you. And the deadline of July 10th had been pushed, and publication did not happen until October 28th. However, due to that failure of the timely publication, the tax resulting from that increase in the assessment was deemed to be inbound, as counsel had stated. Now, again, Anders involves a publication where there is a non-quadrennial year that was an assessment, which is required to be completed around July 10th. However, it did not involve a quadrennial year where the publication is required to be as soon as the assessment had been completed as the statute was then and still remains now with that language. And in fact, in the Court's analysis, as I alluded to earlier, and Andrew, the analysis even brings this conundrum to light that although there is no prescribed date for the publication of the assessment in a quadrennial year, it is the Court's opinion in that case that the legislature intended at least that the taxpayers could rely on that July 10th deadline for assessments made in non-quadrennial years. So I believe that the Court has acknowledged the fact that there is this gray area, so to speak, that's open to interpretation. And in doing so, I think that that makes Andrew's case non-applicable here and not controlling. Thank you very much for answering my questions. Thank you. Okay. Thank you for your argument, Mr. Cook. We're going to hear from Mr. DeBoer. Follow-up. All right. Thank you so much. All right. Thank you, Justice Gates. I think I can clear a few of these things up. First is the issue of a remedy. In Andrew's case, the remedy was to render the increase void. That's exactly what they did. They reverted the assessment from 1972 that they found the increase invalid and went back to 1971. So they did take that remedy directly on. I was going to ask Mr. Cook this. If we fashion a remedy that is consistent with your argument, how would that look? I mean, would we limit our discussion to the plaintiffs in this case? Yes, ma'am. Or would we look at the statute generally and interpret the statute in such a way that it is more broadly applicable? Well, I think when you interpret the statute, you're going to draw a conclusion about what you think it says, and you're going to issue a ruling of law. It's only going to apply in this case to these particular plaintiffs, which would require the assessor to recalculate the assessments and the tax liabilities for the plaintiffs in this case, and there's going to be a small marginal refund to each of those. But your ruling of law would absolutely be taken across the state as being different because then they would know how to apply what we're talking about. At least as to those counties with a population that there's a limitation in there. Now, when my colleague says there's no date in Andrew's, I disagree. There's no physical December 31st, July 10th. But there is a date. It just wasn't addressed in Andrew's because it also says, in each year of general assessment shall publish. What does that mean? Year is a defined term in the statute, 5 ILCS 70-1.10, and it says a year by definition, unless otherwise prescribed, is calendar year. So there is a date in there. It just doesn't say December 31st. It says in each year. That is a definition, but the language is absolutely clear. Now, they cited these other statutes, and the court has them, but if you look at those statutory sites, none of them deal with the late publication of 12-10. They're not even on point. One of them talks about, well, if your assessment's late, or one of them talks about if you tried to get it in the newspaper, but the newspaper had a technical glitch, then you had to fix the glitch. That was not a problem. But none of these statutes that they're citing override the authority and the language of 12-10 and the interpretation of 12-10. So those statutes are really not even relevant. I'm like a dog with a bone here. I apologize. No, I am not. I'm looking at two paragraphs, and the General Assembly says, in each year of general assessment, boom. Shall publish. In years other than years of general assessment, boom. And they put a qualifier in the first one. It doesn't say, in each year of general assessment, shall publish in that year. It just says, identifying those years of general assessment versus years other than general assessment, and in the years other than general assessment, they felt the need to put December 31st, the big year. That's the purpose. I'd ask the court to even consider whether that last sentence, the publication shall be made by December 31st, is it even referring to only the non-public in the year. I don't know. It doesn't ask us to interpret a statute to make a clause meaningless? No, I don't think it makes it meaningless. I think this court can interpret that paragraph to say that that refers to all publications regardless of the year, because otherwise the absurd result, the court knows you can't interpret to get an absurd result. The absurd result is Justice Gates asked, could it be five years down the road that you could do this? And according to them, that would be an interpretation they would follow. So, again, how you leave in each year is clear, and it's never been litigated. The ball plays in the door for Gates when you look at those. During the nine-quad years, still dealt with publications that were made in that assessment year. They were made in, like, July 31st, October 10th, and it's still not before December in those facts years. So, again, this issue of first impression, I believe when you parse the words, in each year shall publish, I think you'll come, I'm hoping you'll come to the conclusion that that has to be the interpretation, because it's not. It's a complete wild west, and there is no guardrails. Unless there's any questions, that's all I have. Justice? No, thanks. I apologize. No, sir, please. I love the questions. One second. Well, then I have another. You do, sir. Maybe splitting hairs on a minor point. I'm still a little bit confused about what you're suggesting the proper remedy is here. I know you're saying that for these main plaintiffs, that the increase is a way to go back to the prior year assessment. If the court would rule as you ask, how does that affect assessments, obligations to pay in 2024 and thereafter? It doesn't. It only affects the tax year that we're complaining of, because, again, the procedures of tax objections are clear. You fix this. Let's say you fix it for this tax year. I'm talking about the assessment number itself. The assessment number given then becomes the obligation for the following year, unless another one is published, correct? Correct. So let's say I'm a taxpayer in this case, sir. I'm sorry. I don't need to know. Go ahead if you want. I'm a taxpayer, so the 2022 increase that I receive, I'm asking you to say that increase isn't valid. I should be taxed in the 22 tax year based on the 21 assessment. But in these subsequent years that we have since seen, 23, 24, those aren't impacted. Those assessments are new assessments that have their own separate rights and circumstances. They're not impacted at all. It's just that one narrow time year. But what this case will do, which I think is of paramount importance, justices, is it's going to lay the foundation of how our assessor and other assessors going forward interpret this. And, again, for what it's worth, there's not any publications happening in subsequent tax years right now, because I watch every year. Thank you. Anything else? No, thank you. Sir, ma'am, sir? Thank you. All right. Thank you, Mr. Tore. Thank you, Mr. Cook. Thank you both for your arguments here today. This is, as you say, a case of first impression. We will take the matter under advisement and issue an order in due course.